IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:11-CR-00195 |
| | : | |
| v. | : | (Judge Mariani) |
| | : | |
| PETER SEPLING | : | (Electronically Filed) |

**SENTENCING MEMORANDUM**

## I.   INTRODUCTION

At Peter Sepling's sentencing hearing in 2014, defense counsel and the government did not provide to the court with any meaningful information about methylone. Based upon admittedly minimal information about methylone, the late Honorable Anthony Richard Caputo imposed a below guideline sentence of 102-months.

However, "[a] significant variance from an arguably high and inaccurate guideline sentence is not a gift." *U.S. v. Sepling*, 944 F.3d 138, 153 (3d Cir. 2019). And based upon that premise, the matter was remanded to the district court. The Court granted a variance and imposed a 102-month sentence, at least in part because dealing in methylone was "somewhat" less serious than dealing in ecstasy or MDMA. "However, Sentencing Counsel could have forcefully argued that methylone does not have "somewhat less of an impact" than MDMA, but rather is

significantly less serious." *Id.* at 149. Additionally, there were significant policy based arguments for a variance that could have been made by defense counsel.

Mr. Sepling has less than a year left to serve on his sentence. After considering the arguments below regarding methylone along with Mr. Sepling's post-sentence rehabilitation, a sentence of time served will be shown to be reasonable.

## II.    CALCULATION OF THE APPROPRIATE GUIDELINE RANGE

At resentencing, this Court must use the 2018 Sentencing Guideline Manual unless such use would violate the *Ex Post Facto* Clause of the Constitution of the United States of America. *See e.g. United States v. Low*, 525 Fed.Appx. 106, 109 (3rd Cir. April 23, 2013) (unpublished). Under U.S.S.G. 1B1.11(a), "The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. (November 1, 2018) 1B1.11. However, if the court determines that such use would violate the *Ex Post Facto* Clause, "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. (November 1, 2018) 1B1.11. The Guideline Manual in effect the date that the offense was committed would be the 2013 Sentencing Guideline Manual.

A full argument under both the 2013 Sentencing Guideline Manual and the 2018 Sentencing Guideline Manual is set forth below to protect against a potential violation of the *Ex Post Facto* Clause.

## III.    GUIDELINES UNDER THE 2013 SENTENCING GUIDELINE MANUAL

In the 2013 Sentencing Guideline Manual, Application Note 6 of Section 2D1.1, "Analogues and Controlled Substances Not Referenced in this Guideline" read as follows:

> Any reference to a particular controlled substance in these guidelines includes all salts, isomers, all salts of isomers, and, except as otherwise provided, any analogue of that controlled substance. Any reference to cocaine includes ecgonine and coca leaves, except extracts of coca leaves from which cocaine and ecgonine have been removed. For purposes of this guideline "analogue" has the meaning given the term "controlled substance analogue" in 21 U.S.C. § 802(32). In determining the appropriate sentence, the court also may consider whether the same quantity of analogue produces a greater effect on the central nervous system than the controlled substance for which it is an analogue.
>
> **In the case of a controlled substance that is not specifically referenced in this guideline, determine the base offense level using the marihuana equivalency of the most closely related controlled substance referenced in this guideline**. In determining the most closely related controlled substance, the court shall, to the extent practicable, consider the following:
>
> (A) Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.
>
> **(B) Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.**
>
> **(C) Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.**

*Id.* (Emphasis added). Methylone was not listed under the 2D1.1 drug quantity tables or in the drug equivalency tables in 2013. However, it was listed as a

controlled substance in the Federal Register effective April 12, 2013. 78 F.R. 21818-21825. As a controlled substance not listed in the drug tables, a court addresses the factors set forth in Application Note 6 to find the most closely related controlled substance.

Dr. Anthony DeCaprio[1] suggests in his report that the most closely related controlled substance is actually N-ethylamphetamine, which was listed in the 2013 drug equivalency tables. It may be the most suitable comparison substance with a ratio of 80:1. [Ex __ - Report of Dr. Anthony DeCaprio.] Dr. DeCaprio reasons that comparisons are difficult to make between controlled substances, but he evaluates a variety of substances referred to by the guidelines. [Ex 2 - Report of Dr. Anthony DeCaprio.] Dr. DeCaprio explains that certain reactions and effects can be measured. Based upon measurements, he found a similarity between methylone and N-ethylamphetamine. And he suggests that the ratio of 80:1 is appropriate. This analysis is set forth more fully in the attached report.

It is anticipated that the Government may argue that MDMA most closely resembled methylone. [2] *See e.g. United States v. Marte*, 86 Fed. Appx. 574, 575 (11th Cir. 2014 December 1, 2014) (unpublished) ("Undisputed testimony from

---

[1] CV for Dr. DeCaprio attached as Ex 1 – Dr. Decaprio CV.
[2] However, even in the 2018 amendments to the Sentencing Guidelines, the Sentencing Guideline Commission chose to place methylone along with synthetic cathinones and not with MDMA.

Dr. Cassandra Prioleau, a pharmacologist for the Drug Enforcement Agency, established that the Agency used a widely accepted methodology to determine that methylone is "most related" to MDMA; methylone, like MDMA, acts as a stimulant on the central nervous system; and methylone is half as potent as MDMA.") In *Marte*, "the district court reasonably determined that one gram of methylone was equivalent to 250 grams of marijuana and then applied that ratio to calculate Marte's base offense level." *Id.* The process followed by *Marte* was to (1) identify the most closely related controlled substance, and (2) adjust for potency.

In an email sent from the Department of Justice in May 21, 2012 to various Assistant United States Attorneys, the Department conceded a 250:1 ratio in methylone cases. The following excerpt from that email summarizes the position of the department at that time:

> For methylone, the most closely analogous scheduled drug is MDMA based on Factors "A" (chemical structure) and "B" (effects). MDMA has a marijuana equivalency of 1 gram equals 500 grams of marijuana. However, DEA ODE states that the potency for methylone is ½ that of MDMA (meaning methylone requires twice the quantity to produce the same effects as MDMA), so the Court could adjust the marijuana equivalency accordingly (presumably, 1 gram of methylone equals 250 grams of marijuana).

[Exhibit 3 - DOJ Email dated May 21, 2012.] This concession was made based upon scientists with the Drug Enforcement Administration Office of Drug

Evaluation. They recommend the ratio for methylone is half that of MDMA.[3]

However, even if this ratio is used, further adjustments to the ratio should be made

based upon policy disagreements with the ratio for MDMA—as set forth in greater

detail below.[4]

 If the ratio of 80:1 is appropriate in this case under the 2013 guidelines, an

objection to the PSR must be sustained. Mr. Sepling maintains that he should only

be responsible for 6 kg of methylone. If the Court agrees, it would result in a

marijuana equivalency for 6 kg of methylone and 1.1 kg of GBL of 489.68 kg

marijuana for a base offense level 28 under the 2013 drug quantity table. However,

after receiving a 2-level variance because of an anticipated amendment to the

sentencing guidelines, Mr. Sepling would have a base offense level 26. Under the

2013 Sentencing Guidelines, with a base offense level 26 and a Criminal History

Category V, the guideline range 110-137 months. If Mr. Sepling is granted

acceptance of responsibility, the offense level would be 24 and a Criminal History

Category V, the guideline range 92-115 months.

---

[3] *U.S. v. Chin Chong*, 13-CR-570 (E.D.N.Y. Sept. 24, 2014) Document 155 at Page 6 referencing Exhibit D.

[4] Mr. Sepling suggests an 80:1 ratio should be used as N-ethylamphetamine is most similar. However, if this Court believes that MDMA is more similar than N-ethylamphetamine, then a further policy disagreement regarding MDMA is necessary to consider as is set forth below under heading IV and the ultimate ratio suggested would be 100:1.

Alternatively, if this Court holds him responsible for 10 kg of methylone, then he would be responsible for a marijuana equivalent of 800 kg. Then for 1.1 kg of GBL (8.8:1) of 9.68kg of marijuana for a total of 809.68 kg for a base offense level 30. After receiving a 2-level variance because of an anticipated amendment to the sentencing guidelines, Mr. Sepling would have a base offense level 28. If the Court agrees that acceptance of responsibility should be granted, then Mr. Sepling would be at a level 26 and a Criminal History Category V, for a guideline range 110-137 months.

As will be discussed further below, these guideline ranges would simply be a starting point for the Court, a further variance should take into account the factors set forth at 18 U.S.C.A. § 3553, including Mr. Sepling's post sentencing rehabilitation.

## IV. THE DRUG CONVERSION RATIO FOR MDMA IN THE 2013 SENTENCING GUIDELINE MANUAL OVERSTATES THE SERIOUSNESS OF MDMA, AND SINCE THE RATIO FOR METHYLONE IS ANCHORED AGAINST THE RATIO FOR MDMA, FURTHER VARIANCE IS WARRANTED.

If this Court applies the 2013 Guideline Manual and reasons that MDMA is still the appropriate comparison,[5] then 250:1 would likely be the appropriate starting ratio for methylone. However, a further downward variance should be

---

[5] To be clear again, Mr. Sepling suggests that the appropriate comparison should be to N-ethylamphetamine with an 80:1 ratio.

granted based upon a policy disagreement. This is because the MDMA ratio has been fraught with problems since the time of its initial adoption.

Policy disagreements with the sentencing guidelines are a valid basis for a variance. *Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). In fact, a district court arriving at a policy disagreement with the MDMA ratio will be reversed if it does not adjust that ratio. *See U.S. v. Kamper*, 748 F.3d 728, 742 (6th Cir. 2014) ("The district court in the instant case misunderstood its authority to reject the Guidelines' MDMA-to-marijuana equivalency ratio and replace it with a more appropriate ratio.")

After considering the history of the MDMA guideline, Mr. Sepling suggests that a reasonable policy-based disagreement justifies a downward adjustment to any ratio referencing MDMA of at least 60% -- in other words, if the ratio is 250:1, then 100:1.

Prior to the enactment of the Ecstasy Anti-Proliferation Act in 2000, MDMA drug offenses had a drug equivalency ratio of 35:1.[6] In 2000, this ratio was increased to 500:1. The United States Sentencing Commission chose the ratio as it fell somewhere in between heroin's 1000:1 ratio and cocaine's 200:1 ratio as follows:

---

[6] United States Sentencing Commission, "Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments" (May 2001).

The Commission did not equate the penalties for MDMA trafficking to the penalties for heroin trafficking because (1) there are many more heroin cases in the federal system than MDMA cases, (2) heroin is more addictive than MDMA, (3) heroin has many more emergency room visits and deaths associated with its use than MDMA because, unlike MDMA which generally is taken orally, heroin is injected, (4) heroin has more violence associated with both its users and distribution system than MDMA, in part because MDMA users typically do not resort to violence to support their drug use, and (5) heroin causes greater secondary health effects, such as the spread of HIV and hepatitis, because it is injected.

United States Sentencing Commission, "Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments" pg. 5 (May 2001). When setting it greater than the ratio for cocaine, the Commission further reasoned:

"The Commission chose a greater penalty structure for MDMA trafficking than for powder cocaine trafficking because (1) unlike MDMA, powder cocaine is not neurotoxic, (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA, and

> (3) powder cocaine is only a stimulant, but MDMA acts as both a
>
> stimulant and a hallucinogen."

*Id.* However, the Commission's reasoning has been called into question over the years by scientific reports.

Evidence of neurotoxicity for MDMA was based upon a scientific study that has since been drawn into serious question. *See* Donald J. McNeil, Jr., *Research on Ecstasy is Clouded by Errors,* N.Y. Times (December 2, 2003). As the Third Circuit noted in remanding this case for a new sentencing hearing in Mr. Sepling's case, later studies on MDMA have found little evidence of any lasting brain damage. *Sepling* at 147-148 n. 47 *noting* ("*See also* John H. Halpern et al., Residual Neurocognitive Features of Long-Term Ecstasy Users with Minimal Exposure to Other Drugs, 106 Addiction 777, 777, 783-84 (2011) (finding "little evidence of decreased cognitive performance" in ecstasy users compared to non-users and cautioning against "ascribing neuropsychological deficits to ecstasy exposure."); Stephen J. Kish et al., Decreased Cerebral Cortical Serotonin Transporter Binding in Ecstasy Users: A Positron Emission Tomography/[ (11)C] DASB and Structural Brain Imaging Study, 133 Brain: A J. of Neurology 1779, 1791 (2010) (noting that this study "did not find a global, massive reduction of brain [serotonin transporter] binding" as claimed by previous studies on the neurotoxicity of MDMA); Alyssa C. Hennig, Comment, An Examination of

Federal Sentencing Guidelines' Treatment of MDMA ("Ecstasy"), 1 Belmont L. Rev. 267, 287-301 (2014) (reviewing scientific studies and social science data on MDMA and concluding that Commission exaggerated the danger of MDMA by relying on unsound science, ignoring available studies showing MDMA likely does not cause lasting brain damage, and overstating social concerns about MDMA use); Amanda Kay, Comment, The Agony of Ecstasy: Reconsidering the Punitive Approach to United States Drug Policy, 29 Fordham Urb. L. J. 2133, 2160-64 (2002) (discussing scientific research on MDMA and explaining that, while there is still a lack of consensus in the scientific community on the neurotoxicity of MDMA, media coverage and prevention education are often misleading and scientists have argued that concerns about the effects of MDMA on the brain have previously been overstated).") The first rationale for the increase in the ratio has been undermined by scientific studies.

The second factor has also faded with time, as the youth market is no longer aggressively targeted with MDMA. As noted in *Sepling*, by 2013 MDMA drug use among youth has declined. *Id.* at 147 n.48.

In *U.S. v. McCarthy*, 09-CR-1136-WHP, 2011 WL 1991146, at *2 (S.D.N.Y. May 19, 2011) the district court concluded that a 200:1 ratio[7] was

---

[7] Since the starting ratio for MDMA was 500:1, a ratio of 200:1 represents a 60 percent variance.

appropriate for MDMA after two days of hearings. The district court so reasoned despite finding that the testimony had not convinced the court that the concern about neurotoxicity was completely unfounded or that it could "discount the Commission's finding that MDMA is uniquely marketed to—and prevalent within—the younger population." *Id.* However, as to the third factor, "[T]he Commission's statement that cocaine is only a stimulant, while MDMA is both a stimulant and a hallucinogen, is without factual support and largely irrelevant." *McCarthy* at *3.

The *McCarthy* court voiced concern that the dangerousness of MDMA versus cocaine had been severely undercut by studies involving emergency room admissions, for example. *Id.* at *3. According to a 2011 study presently found on the Drug Enforcement Agency's website, the admissions were as follows:[8]

---

[8] https://thedea.org/mdma-risks-science-and-statistics-technical-faq/mdma-molly-ecstasy-use-and-death-rate-statistics/



The emergency room admissions for MDMA use appear to be half as many as those for excessive use of Tylenol and only a very small fraction of those when compared to cocaine.

The court in *McCarthy* also found cocaine use to be more associated with addiction, health problems, and violence. *Id.* at *4 When weighing the reasons set forth by the Commission to distinguish heroin and cocaine from MDMA, the court referred to the Commission's process as "opportunistic rummaging." *Id.* In the end, the *McCarthy* court settled on 200:1 for MDMA. This represents a 60 percent downward variance from the 500:1 MDMA ratio listed in the guidelines.

As noted in the internal email from 2012, the Justice Department concedes that methylone is half as potent as MDMA, leading to Justice Department to settle on 250:1. Thus, if this Court determines that MDMA is a proper comparison, an

appropriate starting ratio would be 250:1. However, as the comparison is based upon MDMA equivalency ratios that overstate the seriousness of MDMA usage, then a further downward variance should reflect this policy disagreement. The ratio for methylone with a 60 percent downward variance would be 100:1.

Here, under the 2013 guidelines, assuming a drug equivalency ratio of 100:1, if this Court found Mr. Sepling was only responsible for 6 kg of methylone and 1.1 kg of GBL, then 609.68 kg marijuana would be the converted drug weight for a base offense level 28 under the 2013 drug quantity table. However, after receiving a 2-level variance because of an anticipated amendment to the sentencing guidelines, Mr. Sepling would have a base offense level 26. Under the 2013 Sentencing Guidelines, with a base offense level 26 and a Criminal History Category V, the guideline range 110-137 months. If acceptance of responsibility is granted, then a level 24 and CHC V would result in guideline range of 92-115 months.

Alternatively, the marijuana equivalency for 10 kg of methylone and 1.1 kg of GBL would be 1009.68 kg for a base offense level 32 under the 2013 drug quantity table. However, after receiving a 2-level variance because of an anticipated amendment to the sentencing guidelines, Mr. Sepling would have a base offense level 30. Under the 2013 Sentencing Guidelines, with a base offense level 30 and a Criminal History Category V, the guideline range 151-188 months.

If acceptance of responsibility is granted, then a level 28 and CHC V would result in guideline range of 130-162 months.

Even at this 151-188 month guideline range, if this Court granted the same percentage variance[9] as Judge Caputo, a sentence of 151 months given a 46 percent variance would result in a sentence to 82 months, and a sentence of 188 given a 56.5 percent variance would also result in 82 months. Either would be time served for Mr. Sepling.

## V.   Alternatively, Guidelines under the 2018 Sentencing Guideline Manual would arrive at starting guideline range based upon an 80:1 ratio.

Unlike the 2013 Manual used at the initial sentencing, the 2018 Sentencing Guideline Manual lists synthetic cathinones in the drug equivalency tables, and specifically mentions methylone in the application notes. The drug equivalency ratio for all synthetic cathinones is 380:1. *See* U.S.S.G. (2018) § 2D1.1 n. 27(D). But the Application Notes for synthetic cathinones states, "[A] downward departure may be warranted in cases involving methylone, a substance of which a greater quantity is

---

[9] Assuming the original sentencing guideline range was a level 32 and a CHC V, the guidelines would be 188-235, to arrive at 102 months from a sentence of 235 months requires a variance of 56.5 percent, one arrives at 102 months, to arrive at 102 months from a sentence of 188 months requires a variance of 46 percent.

usually needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone."

The 2018 Adopted Amendments to the Sentencing Guideline Manual provides the following reason for amending the guidelines to include a drug ratio conversion for synthetic cathinones, "Because Commission data indicated that the majority of cases relying on the Application Note 6 process involved synthetic cathinones and synthetic cannabinoids, the Commission concluded that this amendment will alleviate the burden associated with its application."  United States Sentencing Commission, 2018 Adopted Amendment 807 (November 1, 2018) p. 12.

In settling on the 380:1 ratio, the Commission stated, "First, a review of the Commission's data indicated that the 380-gram equivalency was both the median and approximate mean ratio utilized by the courts when sentencing synthetic cathinone cases pursuant to Application Note 6. Thus, the Commission determined that the 380-gram equivalency best reflects the current sentencing practices for courts engaging in the Application Note 6 analysis." *Id.*

It is not surprising that 380:1 was the median and mean for synthetic cathinones since methcathinone had been the only synthetic cathinone listed since 1992 and had been assigned a 380:1 ratio since 1992. As the different compounds which composed the sample were not published in the Amendment, the mean or median of 380:1 is of little practical utility.

The Commission then noted that "Testimony before the Commission established that the effects and potencies of synthetic cathinones range from 'at least as dangerous as cocaine' to methamphetamine-like." *Id.* This was relied upon for setting a range somewhere between that of cocaine and methamphetamine. While that may be accurate for methcathinone, it is not accurate for less potent substances. The Sentencing Commission acknowledges this problem. Recognizing that methylone was not nearly as potent as other synthetic cathinones, the amendments offered the following solution:

> To provide guidance to the court in determining whether to apply the departure, the departure provision identifies substances that the Commission found to be fair representatives of the synthetic cathinones that would fall within the spectrum of substances included in the class, as well as those that may warrant a departure. Specifically, the departure provision notes that: a typical cathinone has a potency comparable to methcathinone or alpha-PVP; **methylone is an example of a lower potency substanc**e; and MDPV is an example of a higher potency substance.

United States Sentencing Commission, 2018 Adopted Amendment 807 (November 1, 2018) p. 14. (Emphasis added). Unfortunately, the suggestion that "methylone is an example of a lower potency" does little more than to lead the parties and the

courts back to the same analysis under Application Note 6(B)(C) that the Commission was trying to avoid. Comparing the potency of methylone with methcathinone is difficult, especially where methylone has long been associated with some type of low potency MDMA within case law but not necessarily within the scientific community. And Application Note 27(D) offers little in the way of guidance as to how to arrive at a ratio for methylone.

Expert opinion is required to suggest a proper ratio when drawing a comparison between methylone and other synthetic cathinones. Dr. Anthony DeCaprio sets forth in his expert report a method for reaching an appropriate ratio, or range of ratios. [Ex 2 - Expert Report of Dr. Anthony Decaprio.] Dr. Decaprio concludes that an appropriate ration would be somewhere between 38:1 and 127:1. And suggests that 80:1 would be a conservative estimate.

If the ratio of 80:1 is appropriate in this case under the 2018 guidelines, an objection to the PSR must be sustained. Mr. Sepling maintains that he should only be responsible for 6 kg of methylone. If the Court agrees, it would result in a marijuana equivalency for 6 kg of methylone and 1.1 kg of GBL of 489.68 kg marijuana for a base offense level 26 under the 2018 drug quantity table. Under the 2018 Sentencing Guidelines, with a base offense level 26 and a Criminal History Category V, the guideline range is 110-137 months. If Mr. Sepling is

granted acceptance of responsibility, the offense level would be 24 and a Criminal History Category V, the guideline range 92-115 months.

Alternatively, if this Court holds him responsible for 10 kg of methylone, then he would be responsible for a marijuana equivalent of 800 kg. Then for 1.1 kg of GBL (8.8:1) of 9.68kg of marijuana for a total of 809.68 kg for a base offense level 28. If the Court agrees that acceptance of responsibility should be granted, then Mr. Sepling would be at a level 26 and a Criminal History Category V, for a guideline range 110-137 months.

## VI.   SENTENCING FACTORS IN SECTION 3553 SUPPORT A DOWNWARD VARIANCE FROM EITHER ADVISORY GUIDELINE RANGE.

Mr. Sepling's post-sentencing rehabilitation and adjustment to prison life, his network of support in the community, and his present circumstances warrant a further downward variance.

### A.   MR. SEPLING HAS ENGAGED IN POST SENTENCING REHABILITATION

"[W]hen a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider evidence of a defendant's rehabilitation since his prior sentencing and that such evidence may, in appropriate cases, support a downward variance from the advisory Guidelines range." *Pepper v. U.S*., 562 U.S. 476, 490 (2011).

Mr. Sepling will tell your Honor that he has worked in the kitchen at FCI-Fort Dix for almost the entire time he has been in prison. He started by mopping floors and wiping tables. Then he was promoted to the kitchen warehouse. In the warehouse, he restocked all items, defrosted meats for meals, and performed other duties. He most recently worked in vegetable preparation, preparing all fruits and vegetables for the meals.

In his time there, he recalls having only one disciplinary report.

Over the years, his schedule required him to be up at 4:00 a.m., reporting to work at 4:30 a.m.  He worked until 11 a.m., then showered, read, and rested. At 4:00 p.m. he woke up for count and then ate dinner.  And at the end of the day, he would go outside for a walk with a friend or go to the gym before watching television for a couple of hours, showering and reading before bed.  COVID-19 has changed this routine.

Over the past years, he has spent a lot of his time reading books: Hundreds of books. He has a passion for historical fiction. And he has also read many of the classics while in prison – Old Man and the Sea, the Stranger, Atlas Shrugged. He also enjoys quicker reads for entertainment as well as biographies. Educating himself, staying out of trouble, and working an honest job are all character traits that he learned in prison.

**B.    MR. SEPLING HAS A SUPPORT NETWORK THAT CAN ASSIST HIM WITH REENTRY**

Mr. Sepling has wasted much of his life on drugs and short-term relationships rather than building something more stable. Since his imprisonment, he has reconnected with the Phillips family, whom he has known his entire life and who are planning to assist with his reentry. Mr. Sepling is not married and has no children. [PSR Paragraph 53]. Both of his parents died before he commenced his sentence for the present offense. [PSR Paragraph 53]. The Phillips' are his family. He feels like a member of that family and they feel like he is a part of their family.

Talcott "Tal" Phillips and his family will tell this Court that they are there for Mr. Sepling. Tal Phillips has known Mr. Sepling for three decades. Tal Phillips was like a younger brother to Mr. Sepling. The Phillips's home was ravaged by domestic abuse, and Mr. Sepling—as a teenager—tried to protect Tal, Pamela and Arielle Phillips from their abusive father. As a result of this close bond, Tal Phillips believes he is in a unique position to help Mr. Sepling. Tal Phillips is also in a financial position to provide a wholesome environment and employment for Mr. Sepling. Tal Phillips is married now and his wife works at the Pentagon. Tal Phillips previously owned an insurance company. After closing the insurance business, Tal Phillips is starting a new business involving mobile structures and storage, and he will be able to hire Mr. Sepling in this new business. Tal Phillips's

letter to this Court best describes how he knows Mr. Sepling is anxious to help in his reentry. [Ex 4 – Letter from Tal Phillips.]

Pamela Phillips, mother of Tal Phillips, met Mr. Sepling in 1987, when Mr. Sepling was a teenager. Mr. Sepling would go to the Phillips' home to train with Pamela Phillips ex-husband. At the time, Mr. Phillips was a boxer and had a gym in his house. Mr. Sepling took not only an interest in boxing, but he would consistently go to the sporting events of the Phillips' son and daughter. Mr. Sepling went on to graduate high school and college, all the while maintaining employment. He was a stable influence for the Phillips children when their home environment was often dominated by their overbearing father—Pamela Phillips describes her ex-husband as being "difficult with them." Tal Phillips is more open in describing this as abuse. During those difficult times, Pamela Phillips appreciated Mr. Sepling's ability to calm or distract Mr. Phillips to keep her ex-husband away from Pamela Phillips and the Phillips children. [Ex 5 - Letter from Pamela Phillips.]

Pamela Phillips also describes Mr. Sepling's care for his own elder parents. Towards the end of his father's life, Mr. Sepling moved back in with his father to take care of him. She saw Mr. Sepling care for his father. He would take him to the Phillips for holiday dinners. Pamela Phillips also recalls that Mr. Sepling contributed to the community by helping out with benefits and fundraising.

Observing these behaviors gives her confidence that he can focus on family life and community upon his release. [Ex 5 - Letter from Pamela Phillips.]

Arielle Chortanoff is the daughter of Pamela Phillips. She lives outside of Hershey, Pennsylvania with her husband, who is a member of law enforcement. She sees Mr. Sepling as a stable figure in her family over many turbulent years by providing a sense of security to Ms. Chortanoff. She describes him as a "gentle giant." When looking at what the future may hold for Mr. Sepling, she writes:

> I whole-heartedly believe Pete recognizes his errors and the self-inflicted time lost. He is energetically looking forward to rejoining his family and ensuring the remainder of his time on earth is focused, productive, positive, and full of new memories.

[Ex. 6 - Letter from Arielle Chortanoff].

Mr. Sepling also received a letter of support from Georgette Pavlick-Vivian, a Luzerne County realtor who has also known Mr. Sepling for three decades. She also believes in his future and looks forward to seeing him succeed in life. [Ex. 7 – Letter from Georgette Pavlick-Vivian.]

## C.   MR. SEPLING IS PRESENTLY INCARCERATED AT FCI-FORT DIX AMIDST THE COVID-19 PANDEMIC.

The same prison setting that served as a place of reflection and rehabilitation is now a place of danger to Mr. Sepling. Mr. Sepling is vulnerable to severe illness from COVID-19 because of his health conditions. The PSR notes that Mr. Sepling

was prescribed medication for high blood pressure, heart rhythm problems, and heart failure – Toprol, Lisinopril, Digoxin, and Aldactone. (PSR Paragraph 55.) Mr. Sepling reports a present weight of 275 lbs. and height of 6 foot four inches, giving him a BMI of 33.5 which is in the obese range. While respiratory illness has been a common theme for COVID-19 symptoms, scientists looking at the incidents of severe illness are finding that the virus is attacking the heart and blood vessels as well.[10] These findings help to explain recent CDC data on 14 states that notes that about a third of patients hospitalized for COVID-19 had chronic lung diseases but about one half had pre-existing high blood pressure.

Dr. Nilam Mangalmurti, a pulmonary intensivist at the Hospital of the University of Pennsylvania, "says she has been 'shocked by the fact that we don't have a huge number of asthmatics' or patients with other respiratory diseases in HUP's ICU. 'It's very striking to us that risk factors seem to be vascular: diabetes, obesity, age, hypertension.'"[11]

The PSR also notes a history of steroid abuse, which has been associated with kidney problems, liver problems, enlarged heart, high blood pressure, and increased risk of blood clots.[12]  Mr. Sepling also reports a low white blood cell

---

[10]Merideth Wadman, et al, "How does coronavirus kill?" Science Magazine (April 17, 2020),  https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes

[11] *Id.*

[12] https://www.drugabuse.gov/publications/drugfacts/anabolic-steroids

count, which he believes may be related to high doses of ibuprofen that he has been given for his bad hips while incarcerated. Based upon these grounds, Mr. Sepling filed a motion requesting his immediate release when the COVID-19 outbreak first occurred.

### VII.  CONCLUSION: MR. SEPLING SHOULD BE SENTENCED TO TIME SERVED.

Mr. Sepling has spent most of his time as a model prisoner, serving a sentence imposed in the absence of effective representation from counsel. The appropriate materials have now been submitted to the sentencing court and he has the added benefit of having undergone post-sentencing rehabilitative efforts. Now he asks to be released to a time served sentence into his supportive network of family and friends.

Date: June 11, 2020                  /s/Brandon R. Reish_____
                                     BRANDON R. REISH
                                     Assistant Federal Public Defender
                                     Attorney ID# PA91518

                                     201 Lackawanna Avenue, Suite 317
                                     Scranton, PA  18503-1800
                                     (570) 343-6285
                                     Email: brandon_reish@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I, Brandon R. Reish, Assistant Federal Public Defender, do hereby certify that

this document, the foregoing **Sentencing Memorandum,** filed electronically

through the ECF system will be sent to the registered Participants as identified

on the Notice of Electronic Filing, including the following:

      Francis P. Sempa, Esquire
      Assistant United States Attorney

and by placing the same in the United States mail, first class, postage prepaid, at

Scranton, Pennsylvania, addressed to the following:

      Peter Sepling


Date: June 11, 2020      /s/Brandon R. Reish
                            BRANDON R. REISH
                            Assistant Federal Public Defender
                            Attorney ID# PA91518